UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

Jaime M. Keller,

    Plaintiff,

    v.

Carolyn W. Colvin,
Acting Commissioner of
Social Security Administration,

    Defendant.

Case No. 3:13-CV-494-JVB-CAN

**OPINION AND ORDER**

Plaintiff Jaime Keller seeks judicial review of the final decision of Defendant Carolyn W. Colvin, Acting Commissioner of Social Security, denying her applications for Disability Insurance Benefits and Period of Disability under the Social Security Act. Keller suffered a shoulder injury that by itself was not "disabling" as defined in the Social Security Act. She alleges that the combination of all of her physical and mental impairments should have led the ALJ to find her disabled. The Court does not find that Plaintiff must be entitled to disability benefits, but finds that the ALJ erred in evaluating the extent of Plaintiff's mental impairments as of her date last insured. This error cannot be called "harmless" and therefore requires remand to the Agency.

**A.    Procedural Background**

Keller applied for disability benefits on March 22, 2010, alleging disability beginning on April 4, 2008. (R. 280.) Her application was denied initially on July 6, 2010, and again upon

reconsideration on September 24, 2010. (R. 154–57; 163–66.) Her request for an administrative hearing was granted, and she attended two hearings before Administrative Law Judge ("ALJ") Dennis R. Kramer. (R. 36; 78.) The first hearing took place on June 22, 2011, and a supplemental hearing took place on January 11, 2012, after state agency consultants examined Keller in July 2011. (R. 36, 78.) ALJ Kramer issued an unfavorable decision, and Keller's request for Appeals Council review was denied, rendering ALJ Kramer's decision the final agency action. (R. 1–6, 16, 20–30.)

**B.     Factual Background**

**(1)     *Keller's Background and Testimony***

Keller was born on May 27, 1977; she was thirty years old at the time of her alleged onset of disability, and thirty-four when the ALJ issued his decision. She has a high school education. (R. 83.) She stands five feet, seven inches tall, and at the first hearing she testified that she weighed 247 pounds but that her normal weight before her injury was 200 pounds. (R. 83.)

She testified that she worked previously as a hostess, waitress, head waitress, food supervisor, home health aide, and receptionist. (R. 86–92.) She stopped working in April 2008 when she injured her shoulder at work while setting down a heavy tray full of plates. (R. 85.)

At the first hearing, Keller testified primarily about her shoulder injury and resulting limitations. There were no questions from the ALJ or Keller's attorney about mental limitations, and there was no testimony from Keller regarding any mental impairment. Plaintiff was examined by a state agency psychological consultant the month after this hearing, and he diagnosed her with bi-polar disorder, obsessive-compulsive disorder ("OCD"), and post-traumatic stress disorder ("PTSD"), among other conditions.

At the second hearing, Plaintiff's attorney stated that she had evidence of mental limitations dating back to 2006, and that the inconsistent mental health treatment was due to her inability to pay. (R. 41.) Plaintiff testified that she did not get treatment for mental conditions because she had no insurance and she did not realize that there were serious problems. (R. 42.) She also testified that she had lost her job at a hotel for getting "into it" with the chef, had trouble interacting with people, and had trouble taking orders from supervisors. (R. 49.)

**(2)** *Medical Evidence*

On March 27, 2006, Keller saw Guy Merz, M.D., for right shoulder and hand pain, numbness in her left fingers, and tightness in her upper back. (R. 651.) She also suffered from back spasms that, along with the pain, caused her stress. (R. 615.)

In July 2006, Keller saw Sondra Wilkinson, M.C., at Empact for a behavioral health evaluation. (R. 612–34.) Keller indicated that she had experienced dizziness, headaches, and problems sleeping. (R. 616.) She reported bad mood swings and getting angry over little things, and that it had been an issue for about a year. (R. 618.) She attributed her condition to stress and family issues. (R. 618.) The mental status examination revealed Keller had a slightly irritable mood, blunted affect, realistic self-concept, normal thought process and content, average estimated intelligence, partial judgment and impulse control, and good insight. (R 623.) Wilkinson diagnosed Keller with a moderate episode of Major Depressive Disorder. (R. 624.) Psychosocial and environmental stressors included marital problems and limited access to health care. (R. 626.) Keller received a Global Assessment of Functioning ("GAF") Score of 51, indicating she had moderate symptoms of impaired functioning. (R. 626.)

On August 8, 2006, Keller had an initial counseling session with Joy Dugard at Empact. (R. 631.) She discussed physical and emotional trauma she had experienced in her life and stated that she had mood swings often and they affected her relationship with her fiancé and with co-workers. (R. 632.) A week later, Keller had an EMDR session with Dugard and at the end of the session she had a much lower level of distress and disturbance related to her history of trauma and anger.[1] (R. 633.) In September 2006, Keller reported feeling stressed because she had lost her insurance coverage. (R. 633–34.) Then in October 2006, she informed Dugard that she planned on moving back in with her father, and declined further Empact services. (R. 634.) On November 29, 2006, Keller told an Empact employee that she was no longer covered by insurance and canceled an upcoming appointment. (R. 634, 627.)

On September 22, 2006, Michael Wilmink, M.D., performed an arthroscopy and subacromial decompression bursectomy on Keller's right shoulder. (R. 680.) On September 26, 2006, Kelli Coleman, a registered occupational therapist, prescribed Keller a home strengthening program because she lost insurance coverage and could not afford to pay for physical therapy. (R. 677–79.) On October 3, 2006, Dr. Wilmink cleared Keller to return to work by October 16, 2006. (R. 676.)

A year and a half later, on April 16, 2008, Keller saw Tom A. Karnezis, M.D., for an initial appointment. (R. 443.) She reported that she injured her left shoulder at work on April 4, and Dr. Karnezis noted that x-rays were within normal limits but that an MRI showed evidence of left shoulder impingement and a partially torn rotator cuff. (R. 443.) Keller saw Dr. Karnezis three more times before undergoing surgery on her left shoulder on May 27, 2008. (R. 442, 440,

---

[1] "EMDR" is eye movement desensitization and reprocessing therapy. *See* Captain Evan R. Seamone, *Attorneys as First-Responders: Recognizing the Destructive nature of PostTraumatic Stress Disorder on the Combat Veteran's Legal Decision-Making Process*, 202 Mil. L. Rev. 144, 175 (2009) ("EMDR Therapy is an eight-phase treatment which combines visualization techniques with optical stimulation. Based on the recognition that PTSD affects the two hemispheres of the brain.").

4

436, 433–35.) Dr. Karnezis performed a left shoulder arthroscopic debridement with anterior and superior labral repair, and a partially torn rotator cuff repair. (R. 433–35.) The surgery provided some initial relief, but Keller continued to have pain in her scapulothoracic (shoulder blade) area and crepitus in her shoulder. (R. 428.)

An x-ray taken July 30, 2008, was within normal limits and the x-ray showed good subacromial decompression. (R. 426.) Keller went to physical therapy and had mixed results, but she continued to experience shoulder pain and crepitus. (R. 419–25.) On October 22, 2008, Dr. Karnezis opined that the crepitus could have resulted from a fiber wire stitch used in the May 27, 2008, surgery. (R. 417.)

On October 30, 2008, Keller had a second round of surgeries on her left shoulder. (R. 415–16.) The surgeries included: glenohumeral arthroscopic debridement with removal of Fiber Wires, and arthroscopic subacromial bursectomy and debridement with removal of multiple Fiber Wires. (R. 415.) Two weeks post-surgery, Dr. Karnezis reported that she had a full range of motion in her left shoulder, she was neurologically intact, but had scapulothoracic crepitus. (R. 413.) X-rays taken on December 10, 2008, were within normal limits, and Dr. Karnezis prescribed three-to-four physical therapy sessions every two weeks, with a one-pound weight restriction on the left arm to be increased over the next three weeks. (R. 411.)

Almost three years later, on July 20, 2011, John Heroldt, Ed.D, a state agency consultant, gave Keller a psychological examination. (R. 573.) Dr. Heroldt found that Keller had marked restrictions in her ability to interact appropriately with the public, with supervisors, and with coworkers, and a marked restriction in the ability to respond appropriately to usual work situations and changes in the routine work setting. (R. 574.) She reported several of the same traumatic experiences to Dr. Heroldt that she had discussed in 2006 at Empact. (R. 577.)

5

Dr. Heroldt diagnosed Keller with bipolar I disorder; PTSD; OCD; borderline intellectual functioning; personality disorder; educational and occupational problems; and a GAF score of forty-eight, indicating impaired reality testing and major symptoms of impaired functioning in several areas. (R. 580.)

**(3)** *Medical Expert's Testimony*

James McKenna, M.D., testified as a medical expert at both ALJ hearings. (R. 38, 80.) Dr. McKenna specializes in pulmonary disease and internal medicine. (R. 238.) At the first hearing, Dr. McKenna stated that Keller's "extreme complaints" had no basis in the record and were "markedly out of proportion" with the objective medical evidence in the file. (R. 122.) Dr. McKenna opined that dropping a tray like Keller had on April 4, 2008, was a minor mechanism of injury, and that the resulting shoulder impingement should have been addressed by the first shoulder surgery. (R. 123.) When prompted by Keller to discuss evidence of her spinal tether, Dr. McKenna stated that the spinal tether was objective evidence supporting her complaints and would equal Listing 1.04. (R. 133.) However, Dr. McKenna qualified that the spinal tether did not equal the Listing until January 1, 2011, and that before that date Keller could perform light duty work. (R. 137.)

At the second hearing, Dr. McKenna stated that the spinal tether would equal Listing 1.04A, and that it was equivalent to the listing as early as March 30, 2010. (R. 53–55.) Dr. McKenna stated that the earlier evidence in the file did not show the same impairments that were present during 2010. (R. 55.) He provided a residual functional capacity for Plaintiff's physical limitations that included frequently lifting up to ten pounds; only occasionally lifting between eleven and twenty pounds; never lifting more than twenty pounds; sit, stand or walk for up to

6

two hours at one time; sit, stand or walk for a total of six hours each in and eight hour day; no need for a cane; no reaching overhead with the left arm, but no limitation for the right arm; occasionally handle, and push and pull with the left hand; frequently finger and feel with the left hand; no climbing ladders, ropes, or scaffolds; no crawling; occasional other postural positions; frequently balance; only occasional exposure to heat, vibrating vehicles or tools, and heavy equipment; never be around forklifts; and restrict the noise level to no more than a normal office. This RFC was adopted by the ALJ for the hypotheticals presented to the vocational expert at the second hearing. (R. 56–59, 63–65, 663–68.)

**(4)**    *Vocational Expert's Testimony*

(a)    *First Hearing*

Vocational expert Thomas Grzesik ("VE") testified at the first hearing. Mr. Grzesik is a rehabilitation counselor, and he testified that he had reviewed Plaintiff's work record. (R. 145.) The first hypothetical person presented to the VE had an RFC to do light work, but no work above the shoulder with the left hand, no fully-extended left-hand benchwork, and no far reaching with the left hand.[2] (R. 146–47.) The VE testified that the individual would be able to perform the past work of hostess and receptionist, as well as three other positions: cashier, dining service worker, and electronics worker. (R. 147–48.)

(b)    *Second Hearing*

The vocational expert at the second hearing was Leslie Friels Lloyd, Ph.D., a certified rehabilitation counselor who had reviewed Plaintiff's work history. (R. 63.) Dr. Lloyd testified

---

[2]    There is no hypothetical labelled "second" or "two".

7

on the jobs available for three hypothetical individuals (labelled three, four, and five, by the ALJ). (R. 63–72.)

Hypothetical three included, among others, limitations to occasionally lifting eleven to twenty pounds; only occasionally reaching overhead, reaching in all other directions, handling, fingering, feeling, pushing and pulling with both hands; exposure to noise at moderate office level. (R. 63–65.) The VE testified that two light duty positions and two sedentary positions were available to such a person. (R. 66–67.)

Hypothetical four included limitations to frequently lift and carry ten pounds, occasionally lift and carry up to twenty pounds; sit, stand or walk for two hours straight in eight hour day; sit, stand or walk for six hours total; right hand, continuous fingering and feeling, frequent overhead reaching, reaching, and all other handling and pushing and pulling; left hand, never reaching overhead, occasionally handling and pushing and pulling, and frequently reach, finger, and feel; never climb ladders or scaffolds, or crawl; occasionally climb ramps and stairs, stoop, kneel, or crouch; and the ALJ included other environmental limitations. (R. 68–69.) The VE testified that three positions existed, a sales attendant in a retail setting with 46,000 jobs in Indiana, a general office clerk with 7000 jobs in Indiana, and a personal attendant with 4000 positions in Indiana.

For hypothetical five, the ALJ added to hypothetical four the mental limitations of a moderate ability to make judgment on simple work related decisions, to understand and remember complex instructions, to carry out complex instructions, and to make judgments on complex work related decisions.  The ALJ included a marked impairment in the ability to interact appropriately with the public, supervisors, coworkers, and to respond appropriately to situation changes in routine work setting. (R. 71–72.) The VE testified that this individual was

precluded from all competitive work because of the marked limitation in ability to interact with others. (R. 72.)

**(5)** *ALJ's Decision*

The ALJ found that:

> 3. Through the date last insured, the claimant had the following severe impairments: degenerative disc disease of the lumbar and cervical spine; obesity; status-post left shoulder surgeries; right carpal tunnel syndrome; and left scapulothoracic dysfunction (20 CFR 404.1520(c)). (R. 22.)
> . . . .
> 4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526). (R. 23.)
> . . . .
> 5. After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b), as the claimant could lift and/or carry 11-20 pounds occasionally and up to 10 pounds frequently; sit for 2 hours at one time for a total of 6 hours in an 8-hour workday; stand for 2 hours at one time for a total of 6 hours in an 8-hour workday; and walk for 2 hours at one time for a total of 6 hours in an 8-hour workday. The claimant could frequently reach overhead, in all other directions, finger, and push/pull with the right hand; and continuously finger and feel with the right hand. The claimant could never reach overhead with her left hand; occasionally handle and push/pull with her left hand; and frequently reach in all other directions, finger, and feel with her left hand. The claimant could frequently operate foot controls bilaterally. The claimant could never climb ladders or scaffolds and occasionally climb stairs and ramps; frequently balance; never crawl; and occasionally stoop, kneel, and crouch. In addition, the claimant could never be around unprotected heights, operate a commercial motor vehicle or be around vibrations. The claimant could occasionally be exposed to extreme cold, heat, and unpredictable moving hazards, such as forklifts and robot arms; frequently be exposed to humidity, wetness, dusts, odors, fumes, and pulmonary irritants; and continuously be exposed to moving mechanical parts, such as predictable conveyor belts. (R. 24.)
> . . . .
> Through the dated last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a)). (R. 28.)

The ALJ found that Keller's major depressive disorder had no more than a minimal limitation on her ability to work before March 31, 2009. (R. 22.) And that under the Paragraph B criteria Keller had no more than mild limitations in three functional areas, and no episodes of decompensation. (R. 23.) Further, no acceptable medical source had mentioned any findings that were equivalent to any listed impairment (R. 23.)

The RFC was based primarily on the opinion of medical expert Dr. McKenna. (R. 27.) Dr. McKenna's opinion was given significant weight because of its consistency with the record, and the ALJ's RFC included Plaintiff's limitations that Dr. McKenna found existed as of March 31, 2009. (R. 27.) The ALJ gave "some weight" to Dr. Karnezis's opinions from December 2008 through February 2009. (R. 27.) The ALJ relied on the VE's testimony regarding an individual with the given, and concluded that a significant number of jobs existed in the national economy that Keller could perform, and that Keller was therefore not disabled. (R. 28.)

**C.    Standard of Review**

This Court has the authority to review Social Security Act claim decisions under 42 U.S.C. § 405(g). The Court will uphold an ALJ's decision if it is reached under the correct legal standard and supported by substantial evidence. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). This Court will not reconsider facts, re-weigh the evidence, resolve conflicts in the evidence, decide questions of credibility, or substitute its judgment for that of the ALJ. *Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005). This Court will, however, ensure that the ALJ built an "accurate and logical bridge from the evidence to his conclusion so that, as a reviewing court,

we may access the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002).

**D.      Disability Standard**

To qualify for DIB or SSI benefits, the claimant must establish that he suffers from a disability. A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security Administration ("SSA") established a five-step inquiry to evaluate whether a claimant qualifies for disability benefits. A successful claimant must show:

> (1) he is not presently employed; (2) his impairment is severe; (3) his impairment is listed or equal to a listing in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) he is not able to perform his past relevant work; and (5) he is unable to perform any other work within the national and local economy.

*Scheck v. Barnhart*, 357 F.3d 697, 699–700 (7th Cir. 2004).

An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000).

**E.      Analysis**

Plaintiff makes four primary arguments on appeal: (1) the ALJ's decision was not supported by substantial evidence when he did not consult a medical expert about Plaintiff's

11

mental limitations as of her date last insured and did not explain how he found that she suffered only mild limitations in social functioning; (2) the ALJ impermissibly discounted Plaintiff's mental limitations because she did not seek mental health treatment; (3) the ALJ's assessment of Plaintiff's RFC was not supported by substantial evidence; and, (4) the ALJ improperly discounted Plaintiff's credibility regarding her physical limitations. (DE 15 at 1–2, 16, 18, 22, 24–25).

As a threshold issue, the ALJ found, and Plaintiff does not contest, that Plaintiff was insured through March 31, 2009. (R. 22.) Therefore, Plaintiff must have been disabled on or before March 31, 2009, in order to qualify for disability benefits. 42 U.S.C. § 423(c)(1); 20 C.F.R. §§ 404.110, 404.130(b), 404.132. This means that an impairment or a combination of impairments must have been present *and* disabling as of March 31, 2009, because it is her date last insured. *See Parker v. Astrue*, 597 F.3d 920, 924 (7th Cir. 2010) ("But even if by 2005 she was totally disabled, she had to prove that she was totally disabled by March 2004, because after that date (the 'date last insured,' as it is called) she was no longer eligible for social security disability benefits.").

The Court finds that the ALJ's decision is not supported by substantial evidence because he failed to consider evidence contrary to his conclusion, specifically evidence of Plaintiff's mental condition and explanations for her lack of mental health treatment.

**(1)** *ALJ's Finding that Plaintiff had only Mild Limitations in Three Functional Areas Not Supported by Substantial Evidence*

Plaintiff asserts that at step two the ALJ performed a cursory examination of her mental impairments, and failed to confront the evidence that indicated her limitations in social functioning preclude her from full-time employment. The Commissioner responds that the ALJ's

12

step two finding of no severe mental impairments is supported by substantial evidence, and that Plaintiff failed to produce evidence of a mental impairment before her date last insured.

The severity of mental impairments is initially considered at step two of the sequential analysis. 20 C.F.R. § 404.1520(a)(4). The evaluation follows a "special technique" to determine if there is a medically determinable mental impairment, and if so, the ALJ must rate the degree of functional limitation that results from the impairment. 20 C.F.R. § 404.1520a(b). The technique focuses on four functional areas: activities of daily living; social functioning; concentration persistent or pace; and episodes of decompensation. 20 C.F.R. § 404.1520a(c)(3).

The technique rates the first three functional areas on a five-point scale: none, mild, moderate, marked, and extreme. 20 C.F.R. § 404.1520a(c)(4). The fourth area uses a four-point scale: none, one or two, three, four or more. *Id.* If the impairment is considered "severe" the ALJ must determine if the impairment meets or medically equals a listed mental impairment, and if it does, the claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4)(iii); 404.1520a(d)(2). Generally, a rating of none or mild in the first three areas results in a finding of "not severe" unless evidence shows that there are more than minimal limitations in the ability to do basic work activities. 20 C.F.R. § 404.1520a(d)(1). However, an ALJ must still consider those impairments that are "not severe" in determining the residual functional capacity ("RFC"). 20 C.F.R. § 404.1545(e).

The ALJ acknowledged the special technique and found that Plaintiff had mild limitations in social functioning. But the only evidence he cited in support of this finding was Plaintiff's testimony she "lived with her husband and did not note any difficulty with it." (R. 23.) The ALJ does not discuss any of the evidence from Empact in 2006 that shows Plaintiff had trouble interacting with others at home and at work, had partial judgment and impulse control, or Plaintiff's testimony that she had been fired from a job at a hotel because she "got into it" with

13

the chef (which, if the ALJ finds Plaintiff's testimony credible, could be evidence of Plaintiff's inability to interact appropriately with at least one co-worker). (R. 618, 623, 49.) And, the ALJ deliberately ignored evidence from the state agency psychological consultant that Plaintiff had marked limitations in all three functional areas, when he stated in a footnote that he would not consider Dr. Herodlt's opinion. (R. 23 n.1.)

**(2)** *ALJ's Finding that Plaintiff had No Severe Mental Impairments Not Supported by Substantial Evidence*

A claimant generally must prove that she is disabled by providing the SSA with evidence the agency can use to determine medical impairments. 20 C.F.R. § 404.1512(a). However, the ALJ has a duty to develop a full and fair record if the provided evidence is insufficient or inconsistent. 20 C.F.R. § 303.1520b; *Barnett v. Barnhart*, 381 F.3d 664, 669 (7th Cir. 2004). An ALJ cannot draw any inference from a claimant's failure to seek treatment without considering the claimant's explanations or other evidence in the record that may explain the failure to seek treatment. SSR 96-7P, 1996 WL 374186 at *7 (Jul. 2, 1996). If the evidence remains insufficient, despite efforts to fully develop the record, the SSA makes a disability decision using the evidence it has. 20 C.F.R. § 404.1520b(d). However, the decision cannot be supported by substantial evidence when the ALJ failed to confront evidence contrary to his conclusion. *See Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) ("An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding.").

In *Parker v. Astrue* the Seventh Circuit remanded a case because the ALJ contradicted himself while discussing when the claimant's symptoms of mental impairments first appeared. 597 F.3d at 924. The ALJ stated that the claimant suffered from post-traumatic stress disorder

("PTSD") and depression as of her date last insured, but then stated that none of her psychiatric impairments surfaced until after. *Id.* The record showed that the claimant had symptoms of PTSD before her date last insured and the claimant's doctor listed PTSD and depression on the "client problem list" one month after the date last insured. *Id.* at 923.

The court in *Parker* provided two ways to answer whether the claimant's mental limitations were disabling prior to her DLI: (1) determine if "the plaintiff's ailments are at present totally disabling, and, if so . . . retain[] a medical expert to estimate how grave her condition was" as of the date last insured; or (2) consider all relevant evidence, including evidence of claimant's condition at present, and directly determine if the claimant was totally disabled by the date last insured. *Id.* at 925.

In Plaintiff's case, in July 2011, Dr. Heroldt diagnosed Plaintiff with bipolar I disorder, obsessive-compulsive disorder, PTSD, borderline intellectual functioning, personality disorder NOS, and assigned a GAF score of 48. (R. 580.) But, Dr. Heroldt provided that he could not identify an on-set date for those diagnoses pre-dating his evaluation. (R. 574.) The ALJ expressly relied on this limited diagnosis to exclude Dr. Heroldt's opinion from the analysis at step two. (R. 23 n.1.) The ALJ failed to follow either of the paths set out in *Parker*. Dr. Heroldt's July 2011 psychological diagnoses would likely preclude Plaintiff from full time employment as of July 2011 so under the first step the ALJ should have retained a medical expert to estimate how grave Plaintiff's mental impairments were as of March 31, 2009, her date last insured. Otherwise, the ALJ should have actually considered Dr. Heroldt's opinion, along with all other relevant evidence to directly determine if Plaintiff was disabled as of March 31, 2009.

Additionally, the ALJ's decision is not supported by substantial evidence because he "cherry picked" facts from the record that supported his conclusion while ignoring evidence

contrary to the conclusion. The ALJ had evidence of Plaintiff's mental health therapy from Empact in 2006, the opinion evidence of state examining psychologist Dr. Heroldt from July 2011, and Plaintiff's testimony at the second hearing as to why she did not seek further mental health treatment after 2006. Instead, he limited his discussion to Plaintiff's testimony that she had no trouble living with her husband as of her date last insured, and her lack of mental health treatment from April 2008 to March 2009.

The ALJ's failure to consider explanations for Plaintiff's lack of mental health treatment is a final reason that the ALJ's finding of no severe mental impairment is not supported by substantial evidence. *See* SSR 96-7P at 1996 WL 374186 *7. The ALJ states that Plaintiff did not seek mental health treatment between April 4, 2008, and March 31, 2009, and that Plaintiff was diagnosed with depression at Empact in 2006 but did not seek any further treatment. (R. 22–23). In her brief, the Commissioner elaborates that the evidence of Plaintiff's lack of mental health treatment, even after she regained insurance coverage in April 2010, demonstrates that "she did not believe she needed such treatment." (DE 21 at 8). But Plaintiff offered an explanation for her failure to seek treatment that the ALJ does not appear to have considered.

Plaintiff testified that she did not have insurance and could not afford to continue mental health treatment, and that she did not realize the severity of her mental conditions. (R. 42.) This testimony is consistent with the notes from Empact, and the notes from Dr. Wilmink and occupational therapist Coleman. (R. 42, 633–34, 678–79, 680.) The notes from Empact and Coleman indicate that Plaintiff reported she lost insurance coverage, so she neither continued attending counseling at Empact nor began physical therapy with Coleman following her September 22, 2006, right shoulder surgery. (R. 633–34, 678–79.) The ALJ's failure to consider

explanations or other reasons why Plaintiff did not seek or continue treatment for mental health conditions is additional reason this case must be remanded.

**(3)** *Not Harmless Error*

In *Pepper v. Colvin*, the Seventh Circuit held that an ALJ's error in executing the special technique was harmless because the court was convinced the ALJ would reach the same result on remand. 712 F.3d 351, 367 (7th Cir. 2013). In that case the ALJ did not use the required point scales, but the court found that a plain reading of the decision showed that the ALJ discussed evidence related to the four functional areas. *Id.* at 366. In this case, the ALJ assigned point values to each of the functional areas, but as discussed above, these findings are not supported by substantial evidence. The ALJ's error was not harmless when he failed to adequately articulate reasons for finding no severe mental impairments, or to include limitations related to mental impairments in the RFC. This was not harmless error because the VE at the second hearing testified that a hypothetical individual with a marked impairment in the ability to "interact appropriately with the public, . . . supervisors, . . . coworkers" would rule out all work because that person would be unable to "sustain a working level relationship with anyone in her environment." (R. 71–72.)

**(4)** *Credibility Determination*

Plaintiff's final argument is that the ALJ impermissibly discounted her credibility about the extent of her physical limitations by relying on her activities of daily living. An ALJ's credibility determination should be upheld unless it is "patently wrong." *Clifford*, 227 F.3d at 872.

17

The Court cannot say that the credibility determination in this case was patently wrong because the ALJ did not solely [base] the determination on Plaintiff's activities of daily living. The ALJ relied on Plaintiff's reported activities of daily living and her course of treatment for physical injury. However, the ALJ should re-evaluate the Plaintiff's credibility, for both physical and mental limitations, as necessary on remand.

**(5)** *Physical Limitations in the RFC Supported by Substantial Evidence*

This case is being remanded due to deficiencies in the evaluation of Plaintiff's alleged mental impairments. Plaintiff's claims as to the physical limitations provided in the ALJ's RFC do not have much merit, and will therefore be considered briefly.

Plaintiff argues that the ALJ ignored contrary evidence by not discussing opinions from Dr. Bernard Bach and Dr. Freedburg regarding her ability to work full time. The Commissioner responds that these opinions were either disability determinations reserved for the Commissioner, or that the opinions were not contrary to the ALJ's decision.

The Commissioner has the better argument here, Drs. Bach and Freedburg expressed opinions as to Plaintiff's ability to work full-time as a waitress. The ALJ was not required to adopt or address these opinions given that the physical RFC excluded Plaintiff's past relevant work, work that included waitress.

Plaintiff next argues that the ALJ impermissibly "cherry picked" from Dr. Karnezis opinions by not including evidence from April 2009 that Plaintiff had no use of her left arm. But, the Commissioner points out that in those notes Karnezis stated Plaintiff's left arm weakness was inconsistent with her other symptoms, and asserts that Dr. Karnezis' April 2009 opinion is rebutted by Dr. Freedburg's October 2009 opinion that Plaintiff could return to light duty work.

(DE 21 at 11). The only medical evidence related to physical impairments that the ALJ discusses which post-dates the date last insured are the evidence from the medical expert Dr. McKenna, and the evidence from the state consultative examiner, Dr. Inabnit. (R. 23 n.1; 27; 27 n.3.)

The ALJ did not "cherry pick" from the record because Karnezis's note was not a medical opinion contrary to the decision. The ALJ followed the *Parker* requirement, by determining that Plaintiff would have been disabled in the present, due to the spinal tether condition, and enlisted the help of a medical expert to determine the extent of Plaintiff's limitations as of her date last insured. *See Parker*, 597 F.3d at 925. The ALJ's physical RFC is therefore supported by substantial evidence.

**F.     Conclusion**

For the foregoing reasons, Plaintiff's request for remand is GRANTED. The case is remanded to the Social Security Administration.

SO ORDERED on September 30, 2014.

    S/ Joseph S. Van Bokkelen
JOSEPH S. VAN BOKKELEN
UNITED STATES DISTRICT JUDGE